**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| JANTSCH SLAGGIE ARCHITECTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 4:07-cv-00041-ODS |
| | ) | |
| SCOTT SLAGGIE, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MICHAEL D. JANTSCH, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JANTSCH SLAGGIE EQUIPMENT AND | ) | |
| SERVICES, INC., | ) | |
| | ) | |
| Third Party Defendants. | ) | |

## AMENDED COUNTERCLAIM AND THIRD PARTY PETITION

Defendants Scott Slaggie and Slaggie Architects, Inc. based upon information and belief state the following as their First Amended Counterclaim and Third-Party Petition in the above cause.

### The Parties and Jurisdiction

1.       Defendant/Third-Party Plaintiff Scott Slaggie ("Slaggie") is a Missouri resident, former officer and director of Plaintiff Jantsch Slaggie Architects, Inc. ("JSA"), current minority shareholder in JSA, and current shareholder of Third-Party Defendant Jantsch Slaggie Equipment & Services, Inc. ("JSES").  Slaggie brings this action both individually and derivatively as a shareholder of JSA and JSES.

2.       Defendant/Third-Party Plaintiff Slaggie Architects, Inc. is a Missouri corporation

with its principal place of business at 4600 Madison Avenue, Suite 350, Kansas City, Missouri 64112.

3.     Plaintiff JSA is a Missouri corporation with its principal place of business at 208 Delaware, Kansas City, Missouri, 64105 in Jackson County, Missouri.

4.     Third-Party Defendant Michael D. Jantsch ("Jantsch") is a Missouri resident and current president and director of JSA, and may be served with legal process at 655 W. 70th St., Kansas City, Missouri, 64113.

5.     Third-Party Defendant Jantsch Slaggie Equipment and Services, Inc. ("JSES") is a Missouri corporation.  JSES is the owner of property and equipment which is leased by JSES to JSA.  The Board of Directors for JSES are Slaggie and Jantsch.  At all material times and at the present, Slaggie and Jantsch each own 50% of the outstanding shares of JSES.

## General Allegations

6.     Slaggie and Third-Party Defendant Jantsch jointly established JSA in 1998.  JSA was and is a corporation established to provide architectural services.  At the time of its creation, Jantsch was a majority shareholder, with 55% of JSA's shares (5,500 shares).  Slaggie, the only other shareholder in JSA, owned 45% (4,500 shares).  Jantsch was President of JSA and Slaggie was Vice President and Secretary of JSA until his resignation.  Each also was one of the two voting members of JSA's Board of Directors, the governing body of JSA.

7.     Subsequently, Greg Highbarger was added as a shareholder in JSA.  With the addition of Mr. Highbarger, Jantsch retained a majority of the outstanding stock, with 52.5% of JSA's stock (5,725 shares).  Slaggie held 42.5% (4,725 shares).  Mr. Highbarger held 5% (550 shares).  The parties retain the same percentage of ownership to this day.

## A. The JSA Employment Agreement

### 1. The Finding, Binding & Grinding ("FBG") Agreement

8.      In or about 2002, Slaggie and Jantsch agreed that the compensation to be paid by JSA to Jantsch and Slaggie would include customary monthly compensation of: (1) Salary; and (2) Distribution based on stock ownership. In addition to this monthly compensation, the parties agreed that compensation would include (3) Bonuses based on the net cash profit generated for JSA as a result of their respective business (hereinafter "Finding, Binding & Grinding Agreement" or "FBG Agreement"). Compensation paid pursuant to the FBG Agreement usually exceeded the proceeds of their monthly compensation.

9.      The FBG Agreement was approved by Slaggie, Jantsch and the JSA Board of Directors as the method by which Slaggie and Jantsch would be compensated. It was also agreed that all compensation paid would first be approved by both Jantsch and Slaggie.

10.     Furthermore, as had always been the case since JSA's initial inception in 1998, as officers and the only two directors of JSA, Jantsch and Slaggie agreed that, in addition to the decisions as to shareholder compensation, all other corporate decisions would first be approved by both Jantsch and Slaggie, and not by any individual director. They also agreed they would each have unlimited and equal access to all JSA financial information, including all FBG compensation payments and calculations as well as all other information concerning the operation and management of JSA.

11.     Under the FBG Agreement, the net cash profit attributable to each shareholder was calculated by deducting from gross cash profits both fixed and variable costs. Fixed costs included non-payroll direct expenses such as rent, utilities, insurance, etc. Slaggie absorbed a larger percentage of these fixed costs than his percentage of ownership in JSA. Variable costs

were determined based on employee, consultant and other costs directly attributable to the shareholder in generating their respective book of business for that fiscal year.

12.     The parties agreed that a monthly salary and distribution would be paid to each shareholder as well as quarterly bonuses.  These quarterly bonuses eventually were adjusted to incremental bonuses every four months.  These incremental bonuses were made as an advance on final FBG calculations which were to be based on cash received by JSA through December 31, the JSA fiscal year end.

13.     From 2002 through the end of May of 2005, O'Connor and Grant served as JSA's corporate accountant.  JSA retained O'Connor and Grant year after year to prepare the basis of the FBG agreement, the year end FBG calculations, as well as tax planning, and year end tax filings.

## 2. The "Management Fee"

14.     Beginning in or about 2003, Third-Party Defendant Jantsch began to misuse his corporate status and position in an effort to increase his own personal compensation at the expense of JSA, Slaggie and Highbarger.  This misconduct was precipitated by a dramatic increase in Slaggie's book of business which meant more compensation for Slaggie under the terms of the JSA compensation agreement.  The increased business was due to Slaggie's personal talent, hard work, and business acumen.  Meanwhile, Jantsch's own book of business remained flat in comparison.

15.     Disgruntled by Slaggie's success, Jantsch began to insist on additional and unjustified increased compensation.

16.     As a part of this effort, beginning in 2003, Jantsch demanded to be paid a "management fee," despite the fact that each architect of the firm separately managed their own

4

client accounts and JSA had a full-time "office manager/ bookkeeper" on staff.

17.    In an effort to avoid confrontation, Slaggie agreed to Jantsch's demands, and consented to Jantsch being paid a $30,000.00 per annum management fee.

18.    However, Slaggie told Jantsch that JSA should consider hiring a manager to perform the "management work" being performed by Jantsch so that Jantsch could pursue projects as an architect.  This recommendation was also made by the JSA accountant as well as other business advisors.  Jantsch did not follow these recommendations.

### 3.  Unauthorized Acts of Jantsch to Increase His Personal Compensation and Deprive Slaggie of Any Voice in Corporate Decisions

19.    At the end of fiscal 2004, the JSA accountant made preliminary FBG calculations and provided them to JSA.  The calculations demonstrated that Slaggie's cash business had increased significantly and hence his FBG compensation had again escalated substantially.  The cash business generated by Jantsch did not show a similar increase.

20.    In furtherance of his efforts to undermine and unilaterally control shareholder compensation for his own personal advantage, upon receipt of these calculations Jantsch told the JSA accountant that the FBG calculations should be provided only to Jantsch who would, after his review and adjustment, distribute them to Slaggie and Highbarger.  Despite Jantsch's assurances that the financial information would be provided to Slaggie, the information was not forthcoming and, in fact, was withheld from Slaggie by Jantsch.  Slaggie had to make requests directly to the JSA accountant to receive the same information being provided to Jantsch.

21.    Eventually, in early 2005, the final FBG calculations were made by the JSA accountant and approved by Jantsch and Slaggie.  Distributions to Jantsch, Slaggie and Highbarger were made in accordance with these calculations.

22.    Although Jantsch did not dispute the calculations, he was not happy with the

amount of his compensation. Disgruntled by Slaggie's increasing success, Jantsch continued to look for ways he could receive additional compensation whether he earned it or not and irrespective of any decision or approval by Slaggie or the Board of Directors.

23.     In furtherance of this objective, Jantsch therefore demanded that he be given a management fee for the fiscal year 2004 in the amount of $60,000.00 rather than the agreed upon $30,000.00 fee, in addition to any sums owed to him under the FBG Agreement. The demand by Jantsch for double his management fee was made retroactively, after the end of the 2004 fiscal year and after preliminary FBG calculations had been made.

24.     Jantsch also demanded that he receive additional compensation based on stock ownership, even though JSA carried no debt, and the fixed costs of the company were not based on stock ownership. In fact, Slaggie carried a higher percentage of the firm's fixed costs than Jantsch.

25.     Neither the $60,000.00 management fee nor additional compensation based on equity was ever agreed to by Slaggie or the JSA Board of Directors.

26.     Given the previous recommendation to Jantsch that an outside manager be retained, which Jantsch chose not to follow, Slaggie was reluctant to agree to any 2004 increase in Jantsch's management fee. Furthermore, by early 2005, JSA employed not only a full-time office manager, but a receptionist. The addition of the receptionist further relieved Jantsch of some of the burden of his "management" duties of the firm. Moreover, Slaggie did not believe it was appropriate for Highbarger and Slaggie to be solely responsible for Jantsch's management fee. Jantsch also had architectural clients he was servicing that required management, as each architect of the firm separately managed their own client accounts. Jantsch was, in effect, getting paid to manage his own accounts, work that Slaggie and Highbarger did for their own clients for

6

no additional compensation.

27.     Furthermore, Jantsch had failed and neglected to competently manage the firm in several respects, including the improper allocation of A/R in 2003 FBG calculations, improper classification of lease payments, and the retention of outside firms to provide basic accounting services that, as he was being compensated for firm "management," he should have handled internally.  In addition, ignoring the advice of the corporate accountant, Jantsch failed to timely pay his personal income tax on his compensation resulting in a $6,000.00 tax penalty ultimately paid by JSA.

28.     Nevertheless, in a good faith effort to maintain firm harmony, Slaggie agreed that Jantsch could receive a $45,000.00 management fee for the fiscal year 2005 if it was paid by Jantsch, Slaggie and Highbarger pro rata based on their respective 2005 variable costs.

29.     Apparently not satisfied with his proposal, beginning in fiscal year 2005, Jantsch undertook measures to deprive Slaggie of any effective voice in JSA or JSES business decisions and misused his director and shareholder status in several acts of self-dealing.

30.     Without disclosing it to Slaggie, Jantsch utilized JSA finances and JSA's accountant to pursue his own individual investment in the Muehlbach building and caused a check in the amount of $10,000.00 to be written for his own personal benefit from the JSES account without disclosing or discussing it with Slaggie.

31.     In early June of 2005, while Slaggie was on vacation, Jantsch suddenly terminated O'Connor and Grant as JSA's accountant without consulting with or receiving authority from Slaggie to do so.

32.     Subsequently, on July 13, 2005, in an unauthorized act of self-dealing, Jantsch issued a check to himself from JSA funds in the amount of $40,000.00.  The check was dated

7

July 13, 2005 and negotiated by Jantsch on July 14, 2005.

33.     On or about July 15, 2005, at or around 5:00 pm as Slaggie was preparing to leave for the day, Jantsch provided Slaggie with a memo dated July 10, 2005 informing Slaggie that on or about July 10, 2005, without consulting or discussing it with Slaggie or calling a meeting of the JSA Board of Directors, Jantsch unilaterally determined Jantsch should be paid $40,000.00 in additional compensation for 2004.   Simultaneously, Jantsch unilaterally determined Slaggie's 2004 compensation should be decreased by $50,000.00.   Jantsch was not authorized to make either determination.   Moreover, Jantsch informed Slaggie that the compensation bonuses that were owed to Slaggie and Jantsch for the first four months of 2005 were $20,000.00 to Jantsch and $60,000.00 to Slaggie.   Jantsch therefore directed the bookkeeper to reduce Slaggie's bonus checks by a total of $50,000.00.

34.     Jantsch did not provide any documentation to support any of his calculations, nor did he provide any explanation as to the reasons for his unilateral and unauthorized acts.   In fact, Jantsch immediately left town for an approximately two week vacation without discussing any of his actions with Slaggie.

35.     Around the middle of June, about the same time he issued checks to himself, in yet another act of self-dealing, Jantsch retained a new corporate accountant for JSA.   Jantsch excluded Slaggie from the hiring process as well as discussions with the accountant regarding the corporate structure of JSA and compensation agreements in place between the principals.

36.     Without discussing it with Slaggie, Jantsch directed the new accountant to make 2004 compensation calculations, and further failed to disclose to Slaggie the methods by which the accountant was told to make such calculations.   This was done despite the fact Jantsch had previously agreed to the 2004 FBG calculations as determined by O'Connor & Grant. On or

8

around September 1, 2005, the new corporate accountant met with Jantsch, Slaggie, and Highbarger. The purpose of the meeting was to discuss 2005 compensation. Instead, Jantsch proposed new 2004 compensation which he had the new accountant calculate using methods never agreed to by Slaggie and contrary to FBG Agreement.

37.     On or around September 8, 2005, Jantsch caused JSA to pay Slaggie a bonus amount that was insufficient based on the FBG Agreement. Jantsch did not provide Slaggie with the information necessary to determine what Slaggie was owed under the FBG Agreement.

38.     Because Jantsch was not forthcoming with any financial information concerning his unilateral decisions and the new accountant's calculations, Slaggie contacted the new JSA accountant directly and asked him to provide Slaggie with the necessary calculations in accordance with the FBG Agreement. The accountant was given ample time but never produced the calculations. This is despite the fact that at the time of request, Slaggie was a director and officer of the corporation, and in fact, through his book of business, was paying most of the accountant's fees due to his burden of paying the largest percentage of fixed and variable costs.

39.     On October 4, 2005, Jantsch informed Slaggie directly that the corporate accountant would not provide any financial information to Slaggie.

40.     Jantsch failed and refused to make any additional bonus payments to Slaggie for the balance of 2005.

41.     From January 1, 2005 to October 18, 2005, Slaggie worked for JSA and generated fees for which he was entitled to compensation by JSA in accordance with the Finding, Binding and Grinding Agreement (FBG), including compensation for work completed by Slaggie on Slaggie's matters through October 18, 2005.

42.     From January 1, 2005 to October 18, 2005, based on the Finding, Binding and

9

Grinding Agreement, Slaggie was entitled to receive compensation for services provided and collected through the date of termination. In addition, Slaggie is entitled to receive his portion of the FBG cash receipts of outstanding receivables that were invoiced for his book of business prior to October 18, 2005.

43.     Despite Slaggie's entitlement to such compensation, Jantsch unilaterally caused JSA to refuse to pay such sums to Slaggie in breach of JSA's compensation agreement with Slaggie, as well as the agreement between JSA, Jantsch and Slaggie that compensation and corporate decisions would be approved by both Slaggie and Jantsch before they were made.

44.     In addition to these unilateral acts, Jantsch did one or more of the following unauthorized, illegal and oppressive acts depriving Slaggie not only of the compensation owed to him by JSA but also depriving him of any voice in significant corporate decisions:

        (a)     Made excessive payments to himself in the form of salary and bonus.

        (b)     Made excessive payments to himself for management fees which were far in excess of the actual value of his services and were never approved.

        (c)     Failed and refused to provide Slaggie, a JSA director, officer and shareholder with unrestricted access to the financial information of JSA.

        (d)     Failed to provide and concealed from Slaggie information he received from JSA accountants concerning compensation to be paid Slaggie, Jantsch and Highbarger.

        (e)     Failed and refused to provide an accounting or other documentation to support his unilateral and unauthorized payments to himself.

        (f)     Failed and refused to provide an accounting or other documentation to support his unauthorized deductions to compensation owed by JSA to Slaggie

(g)     Terminated the services of JSA's corporate accountant while Slaggie was on vacation.

(h)     Retained a new corporate accountant without consulting with Slaggie and gave the accountant direction inconsistent with the FBG Agreement.

(i)     Directed the replacement accountant not to provide information to Slaggie even though Slaggie was an officer and director of JSA.

(j)     Failed and refused to provide any factual support for his unauthorized decisions with respect to his personal compensation or the compensation of Slaggie as well as the basis for his conduct as described in paragraphs (a) and (b) above.

(k)     Directed corporate accountants to perform accounting services for the personal benefit of Jantsch and at the expense of JSA.

(l)     Used JSA funds to pay tax liabilities caused solely by the failure of Jantsch to timely pay income taxes for compensation.

(m)     Held meetings with attorneys for the corporation concerning corporate matters without involving Slaggie or disclosing the nature and substance of those meetings.

(n)     Made company-related purchases by use of his personal credit cards to receive direct personal benefit through rebates and accumulated "points" which were not shared with the company.

(o)     Withheld from Slaggie information on the affairs of JSA and JSES and on policies and decisions being made on their behalf.

45.     Slaggie made repeated demands that Jantsch discontinue his unauthorized and unlimited acts, return the funds unilaterally paid to Jantsch and taken from Slaggie, provide

backup financial or other support for his actions and pay Slaggie his distribution and bonus payments as required by the FBG Agreement. Jantsch refused.

46.     As a result of the material and substantial breaches by JSA of the employment agreement and the acts taken by Jantsch to deprive Slaggie of any voice in business decisions, Slaggie was forced to resign his positions of director and employee of JSA effective October 18, 2005.

47.     To the further detriment of JSA, a few weeks after constructively terminating Slaggie, Jantsch suddenly changed the locks to the doors of JSA without informing several key employees, including Highbarger. In addition, he provided keys to only a few select employees, again to the exclusion of Highbarger. Jantsch also refused to provide employees with access to their computers all of which made it impossible for them to work. As a result of Jantsch's conduct designed to "squeeze out" Highbarger and these employees, some of these "at will" employees sought employment with SAI.

**4.  The Requests For Inspection of Corporate Books and Records**

48.     As noted above, before resigning from JSA, Slaggie sought access to JSA and JSES' corporate books and records on numerous occasions, but was denied access despite his position as an officer, director and shareholder of each corporation.

49.     After his resignation, in an effort to protect his investments in JSA and JSES, Mr. Slaggie submitted repeated requests for inspection of the corporate books and records. As was his custom and practice even prior to Mr. Slaggie's resignation, Mr. Jantsch refused to produce all of the financial records of the corporations.

50.     By letter dated November 11, 2005, Slaggie, concerned about the financial status of JSA, and the competency of its management, sent a formal request for inspection of the corporate

books and records, as was his statutory right as a shareholder of the corporation.

51. After failing to receive any documents in response to his request, Slaggie, through his attorneys, sent another request via email on November 22, 2005, along with a demand that the same access be provided for JSES.

52. Slaggie made a third request for the records of JSA to Jantsch through his attorneys on November 29, 2005.

53. Thereafter, JSA, through its attorneys, made certain books and records of JSA available. However, these records were deficient in that the majority of the records stopped at October 18, 2005, and JSA specifically **excluded** a variety of material from its production of records for inspection. Only a handful of documents were produced regarding JSES.

54. By letter dated January 13, 2006, JSA, by way of Jantsch as President, informed Slaggie that it wished to purchase Slaggie's 4,725 shares in JSA, and that a forced sale of the same would be held on January 30, 2006.

55. Mr. Slaggie was informed that "the aggregate value of your shares has been calculated to be $33,859.13." Mr. Slaggie, refusing to simply take this calculation on faith, submitted two responsive letters to JSA, reiterating his requests for access to the corporate financial records.

56. Slaggie, by and through his attorneys, sent another request for inspection of JSA's books and records on January 19, 2006, on the ground that there was no way to evaluate the offer of purchase without access to JSA's books and records. This request specifically sought JSA's documentation in support of its tender offer for Slaggie's stock in addition to the materials previously sought from the company. Slaggie did not hear any response to this letter.

57. By letter dated January 20, 2005, Slaggie again requested JSA to produce its books

13

and records, in a manner sufficient to allow Slaggie to evaluate the past and present value of the company, and any potential corporate waste. Again, this request sought JSA's documentary support for its valuation of Slaggie's stock. Again, Slaggie was provided with no response.

58. Finally, on January 26, 2005, JSA's attorneys indicated that the closing date of January 30, 2006 would be moved, and that corporate records of JSA would be provided. To date, however, Slaggie has still not had full access to JSA's corporate books and records.

59. Furthermore, to date, Slaggie has still not had full access to JSES' corporate books and records.

60. Despite an order of the District Court of Jackson County, Missouri compelling JSA and Jantsch to produce all financial records to the present to Slaggie, JSA and Jantsch have continued to withhold this information in violation of court order.

61. After resignation from JSA, on or around November 1, 2005, Slaggie had become concerned about the JSES account status in which Slaggie was an officer, director and 50% shareholder, Slaggie contacted the Financial Institution to ascertain information as to its activities and was informed by the Bank Officer that he was denied access as he was no longer an officer of the company.

62. Jantsch, in an additional act of self-dealing, oppression and attempted conversion, on or around October 22, 2005, upon information and belief Jantsch led the Bank Officer to believe that Slaggie was no longer an officer, director or shareholder of JSES and that all sums would be in Jantsch's control.

## AMENDED COUNTERCLAIM AND THIRD-PARTY PETITION

Defendants state the following as their amended counterclaim against Plaintiff Jantsch Slaggie Architects, Inc. and Third-Party Petition against Jantsch and JSES.

14

## Count I
### (Indemnification by JSA)

Slaggie states the following for Count I of his Counterclaim:

63.    Slaggie incorporates by reference all preceding allegations.

64.    In Article VII of the JSA Bylaws, JSA agreed to indemnify and hold harmless Slaggie from any claims asserted against him by reason of the fact that he is or was a director, officer, employee or agent of the corporation including attorneys' fees and amounts paid in settlement actually and reasonably incurred in connection with the defense or settlement of the action or suit.

65.    Slaggie has been sued by JSA by reason of the fact he was a director, officer, employee and/or agent of JSA and Slaggie is therefore entitled to such indemnification.

WHEREFORE, Slaggie prays that JSA indemnify Slaggie and hold him harmless and pay his expenses including attorneys' fees and amounts paid in settlement in accordance with such agreement in such amount as is determined at the time of trial.

## Count II
### (Breach of Employment Agreement v. JSA)

Slaggie states the following for Count II of his Counterclaim:

66.    Slaggie incorporates by reference all preceding allegations.

67.    In consideration of the business generated by Slaggie for JSA, JSA agreed to compensate Slaggie in accordance with the FBG Agreement.

68.    JSA breached its compensation agreement with JSA by failing to pay Slaggie the compensation owed him, including but not limited to:

(a)    FBG compensation for the fiscal year of 2005.

(b)    FBG compensation still due Slaggie for fiscal year of 2004.

(c)　　Monthly shareholder distribution from October 1, 2005 to present.

(d)　　Adjusted distributions and bonus payments for the first two bonus periods at the end of April and August of fiscal year 2005.

(e)　　FBG compensation for business generated by Slaggie for JSA since October 18, 2005.

(f)　　Any FBG compensation due Slaggie that was placed in JSA's cash reserves.

69.　　As a direct result of JSA's breach of its contractual obligations, Slaggie has sustained damages in an amount in excess of $25,000.00 to be determined at trial.

WHEREFORE, Slaggie prays for a judgment in excess of $25,000.000, together with prejudgment interest from the date such sums are due, interest from the date of judgment and such other relief as this Court deems just and equitable.

## Count III
### (Tortious Interference with Employment Agreement v. Jantsch)

Slaggie states the following for Count III of his Counterclaim:

70.　　Slaggie incorporates by reference all preceding allegations.

71.　　In consideration of the business generated by Slaggie for JSA, JSA agreed to compensate Slaggie in accordance with the FBG Agreement.

72.　　Jantsch caused and induced JSA to breach its compensation agreement with Slaggie by failing to pay Slaggie the compensation owed him, including but not limited to:

(a)　　FBG compensation for the fiscal year of 2005.

(b)　　FBG compensation still due Slaggie for fiscal year of 2004.

(c)　　Monthly shareholder distribution from October 1, 2005 to present.

(d)　　Adjusted distributions and bonus payments for the first two bonus periods

16

at the end of April and August of fiscal year 2005.

      (e)    FBG compensation for business generated by Slaggie for JSA since October 18, 2005.

      (f)    Any FBG compensation due Slaggie that was placed in JSA's cash reserves.

73.    In causing and inducing JSA to breach its compensation agreement with Slaggie, Jantsch was acting to increase his own personal compensation to the detriment of JSA and Slaggie.

74.    In causing and inducing JSA to breach its compensation agreement with Slaggie, Jantsch acted without authority, in that compensation decisions could not be made unilaterally by Jantsch without the approval of the board of directors (and therefore Slaggie).

75.    In causing and inducing JSA to breach its compensation agreement with Slaggie, Jantsch acted with a malicious intent to injure Slaggie and increase his own relative compensation.

76.    As a direct result of Jantsch's inducement of JSA to breach of its contractual obligations, Slaggie has sustained damages in an amount in excess of $25,000.00 to be determined at trial

WHEREFORE, Slaggie prays for a judgment in excess of $25,000.000, together with prejudgment interest from the date such sums are due, interest from the date of judgment and such other relief as this Court deems just and equitable.

<u>**Count IV**</u>
**(Breach of Duty of Loyalty Owed by an Officer, Director and Manager of JSA: Derivative Shareholder Suit v. Jantsch)**

Slaggie states the following for Count IV of his Counterclaim:

77.     Slaggie incorporates by reference all preceding allegations.

78.     At all times relevant hereto, Slaggie was an owner and holder of shares in JSA.

79.     Slaggie fairly and adequately represents the interests of the shareholders of the corporation.

80.     As an officer, director, and manager of JSA, Jantsch owed a fiduciary duty and a duty of trust and loyalty to both the corporation and its officers, directors and shareholders which required him to exercise the utmost good faith in the discharge of his duties.

81.     This duty included the duty to act primarily for the benefit of the corporation; the duty to present business opportunities to the corporation; the duty to refrain from competing with the corporation; the duty to refrain from using corporate assets for personal business; and the duty to refrain from taking unfair advantage of his relationship with the corporation for private gain.

82.     By committing the acts and engaging in the conduct described above, Jantsch breached the fiduciary duty and the duties of trust and loyalty that he owed to JSA, and its officers, directors and shareholders.

83.     Jantsch breached his duty to JSA, and its officers, directors and shareholders, in multiple ways, including, but not limited to:

(a)     Taking business opportunities for personal benefit without receiving permission of JSA's board of directors, including but not limited to business opportunities with regard to the Muehlbach Building;

(b)     Using corporate facilities, personnel, and funds for personal business opportunities;

(c)     Using his position as an officer and director of JSA to secure loans and contracts for personal business not shared with the corporation;

(d)     Making unilateral decisions about his own, excessive, compensation;

(e)     Failing to make shareholder distributions and/or pay dividends; and

(f)     Taking other action which was not in the best interests of JSA as described herein.


84.     Any effort to address this behavior through the corporation or its shareholders is and was futile, as Jantsch at all relevant times held an outright majority of JSA's stock, and currently constitutes the only member of the board of directors.  Furthermore, during the time of Slaggie's employment with the company, Jantsch concealed many of his actions, and Slaggie is and was unable to ascertain the full extent of the actions taken contrary to the interest of the corporation.  As such, a derivate suit is the only remedy available to Slaggie.

85.     As a direct and proximate result of the breach of Jantsch's duty of loyalty, Slaggie and the JSA shareholders have been damaged in that their investment in JSA has suffered, and JSA's stock is worth much less than it would be had Jantsch not diverted corporate resources and opportunities for his own benefit.

86.     The acts of Jantsch as described above were intentional, willful, wanton, malicious or otherwise showed a complete indifference to or a conscious disregard of his duties as a corporate officer and director, and the interest of JSA and its shareholders.

WHEREFORE, Slaggie prays that the Court enter a judgment in favor of the corporation and its shareholders, holding that any profits Jantsch made as a result of his usurpation of corporate opportunities by held in constructive trust for the corporation, and that JSA and its shareholders be compensated for misuse of corporate assets.  In addition, Slaggie respectfully prays that the Court further award the corporation and its shareholders punitive damages in an amount that is both fair

and reasonable under Missouri law, as well as the costs expended herein, any attorneys' fees to which they may be entitled, and such other and further relief as the Court deems just and proper.

### Count V
### (Breach of Duty of Loyalty Owed by an Officer and Director of JSES: Derivative Shareholder Suit v. Jantsch)

Slaggie states the following for Count V of his Counterclaim:

87.     Slaggie incorporates by reference all preceding allegations.

88.     At all times relevant hereto, Slaggie was an owner and holder of shares in JSES.

89.     Slaggie fairly and adequately represents the  interests of the shareholders of the corporation.

90.     As an officer, and director of JSES, Jantsch owed a fiduciary duty and a duty of trust and loyalty to both the corporation and its officers, directors and shareholders which required him to exercise the utmost good faith in the discharge of his duties.

91.     This duty included the duty to act primarily for the benefit of the corporation; the duty to present business opportunities to the corporation; the duty to refrain from competing with the corporation; the duty to refrain from using corporate assets for personal business; and the duty to refrain from taking unfair advantage of his relationship with the corporation for private gain.

92.     By committing the acts and engaging in the conduct described above, Jantsch breached the fiduciary duty and the duties of trust and loyalty that he owed to JSES, and its officers, directors and shareholders.

93.     Jantsch breached his duty to JSES, and its officers, directors and shareholders, in multiple ways, including, but not limited to:

(a)     Using funds for personal business opportunities without disclosing such use, and without offering a promisary note;

(b)     Using his position as an officer and director of JSA to secure loans and contracts for personal business not shared with the corporation;

(c)     Attempting to freeze Slaggie out of JSES accounts;

(d)     Failing to make shareholder distributions and/or pay dividends; and

(e)     Taking other action which was not in the best interests of JSES as described herein.

94.     Any effort to address this behavior through the corporation or its shareholders is and was futile, as Jantsch at all relevant times took steps to freeze Slaggie out of his interest in JSES. Furthermore, during the time of Slaggie's employment with the company, Jantsch concealed many of his actions, and Slaggie is and was unable to ascertain the full extent of the actions taken contrary to the interest of the corporation.  As such, a derivate suit is the only remedy available to Slaggie.

95.     As a direct and proximate result of the breach of Jantsch's duty of loyalty, Slaggie has been damaged in that his investment in JSES has suffered, and JSES's stock is worth much less than it would be had Jantsch not diverted corporate resources and opportunities for his own benefit.

96.     The acts of Jantsch as described above were intentional, willful, wanton, malicious or otherwise showed a complete indifference to or a conscious disregard of his duties as a corporate officer and director, and the interest of JSES and its shareholders.

WHEREFORE, Slaggie prays that the Court enter a judgment in favor of the corporation and its shareholders, holding that JSES and its shareholders be compensated for misuse of corporate assets.  In addition, Slaggie respectfully prays that the Court further award the corporation and its shareholders punitive damages in an amount that is both fair and reasonable under Missouri law, as well as the costs expended herein, any attorneys' fees to which they may be entitled, and such other and further relief as the Court deems just and proper.

**Count VI**
**(Breach of Duty of Care Owed by an Officer, Director and Manager of JSA:**
**Derivative Shareholder Suit v. Jantsch)**

Slaggie states the following for Count VI of his Counterclaim:

97.     Slaggie incorporates by reference all preceding allegations.

98.     At all times relevant hereto, Slaggie was an owner and holder of shares in JSA.

99.     Slaggie fairly and adequately represents the interests of the shareholders of the corporation.

100.     As an officer, director and manager of JSA, Jantsch owed a fiduciary duty and a duty of care to both the corporation and its officers, directors and shareholders which required him to exercise the utmost good care and diligence in the discharge of his duties.

101.     This duty included the duty to be competent; the duty to avoid negligent misconduct; and the duty to devote reasonable time and effort to the performance of management and directorial responsibilities.

102.     By committing the acts and engaging in the conduct described above, Jantsch breached the fiduciary duty and the duties of care and diligence that he owed to JSA, and its officers, directors and shareholders.

103.     Jantsch breached his duty to JSA, and its officers, directors and shareholders, in multiple ways, including, but not limited to:

(a)     Negligently managing the corporation's books and records, including but not limited to repeated tax penalties for late tax filings;

(b)     Mismanaging client projects and other pursuits, leading to waste of corporate resources through defending litigation as a result of same;

22

(c)     Wasting corporate resources in engaging in baseless legal disputes with clients over ownership of work done for those clients;

(d)     Forcing out the two of the three JSA architects, Slaggie and Highbarger, thus depriving the corporation of the revenue stream of both architects (In fact, until he was forced out, Slaggie consistently generated the most revenue and corporate good will for JSA);

(e)     Failing to respond to client requests for services;

(f)     Failing to negotiate in good faith with JSA clients with respect to transition of projects from JSA to other architectural firms;

(g)     Failing to make shareholder distributions and/or pay dividends; and

(h)     Taking other action which was not in the best interests of JSA as described herein.

104.    Any effort to address this behavior through the corporation or its shareholders is and was futile, as Jantsch at all relevant times held an outright majority of JSA's stock, and currently constitutes the only member of the board of directors. Furthermore, during the time of Slaggie's employment with the company, Jantsch concealed many of his actions, and Slaggie is and was unable to ascertain the full extent of the actions taken contrary to the interest of the corporation. As such, a derivate suit is the only remedy available to Slaggie.

105.    As a direct and proximate result of the breach of Jantsch's duty of care and diligence, Slaggie and the JSA shareholders have been damaged in that their investment in JSA has suffered, and JSA's stock is worth much less than it would be had Jantsch not squandered corporate resources and negligently managed clients and personnel of JSA.

106.    The acts of Jantsch as described above were grossly negligent or otherwise showed a

reckless indifference to or a conscious disregard of his duties as a corporate officer and director, and the interest of JSA and its shareholders.

WHEREFORE, Slaggie prays that the Court enter a judgment in favor of the corporation and its shareholders, holding that JSA and its shareholders be compensated for the waste of corporate assets and damages done to the corporation through Jantsch's negligence. In addition, Slaggie respectfully prays that the Court further award the corporation and its shareholders punitive damages in an amount that is both fair and reasonable under Missouri law, as well as the costs expended herein, any attorneys' fees to which they may be entitled, and such other and further relief as the Court deems just and proper.

### Count VII
### (Breach of Duty of Care Owed by an Officer, and Director of JSES:
### Derivative Shareholder Suit v. Jantsch)

Slaggie states the following for Count VII of his Counterclaim:

107. Slaggie incorporates by reference all preceding allegations.

108. At all times relevant hereto, Slaggie was an owner and holder of shares in JSES.

109. Slaggie fairly and adequately represents the interests of the shareholders of the corporation.

110. As an officer, and director of JSES, Jantsch owed a fiduciary duty and a duty of care to both the corporation and its officers, directors and shareholders which required him to exercise the utmost good care and diligence in the discharge of his duties.

111. This duty included the duty to be competent; the duty to avoid negligent misconduct; and the duty to devote reasonable time and effort to the performance of management and directorial responsibilities.

112. By committing the acts and engaging in the conduct described above, Jantsch

breached the fiduciary duty and the duties of care and diligence that he owed to JSES, and its officers, directors and shareholders.

113. Jantsch breached his duty to JSES, and its officers, directors and shareholders, in multiple ways, including, but not limited to:

(a) Failing to keep clear distinction between personal and business dealings with regard to JSES assets and accounts;

(b) Withholding financial transactions from other shareholders knowing that said transactions were serving his own interests;

(c) Wasting corporate resources;

(d) Attempting to freeze Slaggie out of corporate accounts;

(e) Failing to make shareholder distributions and/or pay dividends; and

(f) Taking other action which was not in the best interests of JSA as described herein.

114. Any effort to address this behavior through the corporation or its shareholders is and was futile, as Jantsch at all relevant times took steps to freeze Slaggie out of his interest in JSES. Furthermore, during the time of Slaggie's employment with the company, Jantsch concealed many of his actions, and Slaggie is and was unable to ascertain the full extent of the actions taken contrary to the interest of the corporation. As such, a derivate suit is the only remedy available to Slaggie.

115. As a direct and proximate result of the breach of Jantsch's duty of care and diligence, Slaggie has been damaged in that his investment in JSES has suffered, and JSES's stock is worth much less than it would be had Jantsch not squandered corporate resources..

116. The acts of Jantsch as described above were grossly negligent or otherwise showed a reckless indifference to or a conscious disregard of his duties as a corporate officer and director, and

the interest of JSES and its shareholders.

WHEREFORE, Slaggie prays that the Court enter a judgment in favor of the corporation and its shareholders, holding that JSES and its shareholders be compensated for the waste of corporate assets and damages done to the corporation through Jantsch's negligence. In addition, Slaggie respectfully prays that the Court further award the corporation and its shareholders punitive damages in an amount that is both fair and reasonable under Missouri law, as well as the costs expended herein, any attorneys' fees to which they may be entitled, and such other and further relief as the Court deems just and proper.

## Count VIII
### (Breach of Fiduciary Duty Owed by Controlling Shareholder v. Jantsch)

Slaggie states the following for Count VIII of his Counterclaim:

117.    Slaggie incorporates by reference all preceding allegations.

118.    At all times relevant hereto, Slaggie was a minority shareholder of JSA.

119.    At all times relevant hereto, Jantsch held a controlling majority of stock in JSA.

120.    As a controlling stock holder, Jantsch was under a fiduciary duty to refrain from using his controlling interest in JSA for his own profit at the expense of minority shareholders, or to cause the corporation to act in a manner unfair to the minority shareholders.

121.    By committing the acts and engaging in the conduct described above, Jantsch acted oppressively and breached the fiduciary duty he owed to Slaggie as a minority shareholder.

122.    Jantsch breached his duty to Slaggie as a minority shareholder in multiple ways, including, but not limited to:

(a)    Diverting corporate resources to his own benefit;

(b)    Depriving them of any voice in corporate decisions;

(c)    Increasing his own compensation at the expense of the corporation;

26

(d)     Forcing them to resign their positions at JSA after investing substantial time and money;

(e)     Failing to abide by the Shareholder Agreement with respect to the triggering date and other matters; and

(f)     Undertaking steps and actions to devalue the JSA stock after resignation of the minority shareholders in an attempt to purchase the minority shares of JSA at a bargain rate.

123.    As a direct and proximate result of the breach of Jantsch's fiduciary duty, Slaggie has been damaged in that his investment in JSA has suffered, and JSA's stock is worth much less than it would be had Jantsch not misused his majority interest in JSA.

124.    The acts of Jantsch as described above were intentional, willful, wanton, malicious or otherwise showed a complete indifference to or a conscious disregard of his fiduciary duty to Slaggie as a minority shareholder.

WHEREFORE, Slaggie prays that the Court enter a judgment in his favor, holding that he be compensated the true value of his shares in JSA.  In addition, Slaggie respectfully prays that the Court further award him punitive damages in an amount that is both fair and reasonable under Missouri law, as well as the costs expended herein, any attorneys' fees to which he may be entitled, and such other and further relief as the Court deems just and proper.

<u>**Count IX**</u>
**(Prayer for Accounting v. JSA)**

Slaggie states the following for Count IX of his Counterclaim:

125.    Slaggie incorporates by reference all preceding allegations.

126.    At all times relevant hereto, Slaggie was an owner and holder of shares in JSA.

127.    Slaggie fairly and adequately represents the interests of the shareholders of the

corporation.

128.     As an officer, director and controlling shareholder of JSA, Jantsch owed a fiduciary duty and duties of trust and loyalty to both the corporation and its officers, directors and shareholders, requiring him to exercise the utmost good faith in the discharge of his duties.

129.     As an officer, director and controlling shareholder of JSA, Jantsch has misapplied and wasted the assets of JSA, and upon information and belief will continue to waste and misapply the assets of the company, all as is more particularly described above.

130.     Jantsch has further violated the trust and confidence reposed in him and breached the fiduciary and other duties that he owed to JSA and Slaggie by, among other things, diverting corporate assets to his own purposes and deriving personal profits either directly or indirectly from it, all as is more particularly described above.

131.     Jantsch has still further violated the trust and confidence reposed in him and breached the fiduciary and other duties that he owed to JSA and Slaggie by, among other things, intentionally divesting JSA of assets to artificially reduce the value of Slaggie's shares in the company, all as is more particularly described above.

132.     JSA, by way of Jantsch as officer and director, has now sought to purchase Slaggie's shares based on a current calculation of the "worth" of those shares.

133.     Slaggie has requested Jantsch to provide an accurate accounting with respect to his dealings with the corporation's property and business but, despite his requests, Jantsch has refused to provide the same.

134.     Slaggie, despite repeated requests, both before and after his resignation from JSA, has not been allowed full access to the company's books and records.

135.     As such, Slaggie has basis for evaluating the true worth of the company, or what

damage Jantsch has caused due to his incompetence and self-dealing.

136.    Any effort to address this behavior through the corporation or its shareholders is and was futile, as Jantsch at all relevant times held an outright majority of JSA's stock, and currently constitutes the only member of the board of directors.  Furthermore, during the time of Slaggie's employment with the company, Jantsch concealed many of his actions, and Slaggie is and was unable to ascertain the full extent of the actions taken contrary to the interest of the corporation.  As such, a derivate suit is the only remedy available to Slaggie.

137.    Unless Jantsch and JSA are compelled to provide an accurate accounting with respect to Jantsch's dealings with the property and business of JSA, Slaggie will not have an adequate remedy at law since he will not be able to determine with reasonable certainty the damages to which he and/or JSA are entitled as a result of Jantsch's wrongful conduct, or the true value of his shares in JSA.

WHEREFORE, Slaggie prays that the Court (1) direct Jantsch to provide an accurate account with respect to his dealings with the property and business of JSA, including the disposition of the company's funds and property and the values of any corporate opportunities that he improperly usurped or otherwise failed to present and offer to JSA; (2) compelling Jantsch to account for and repay to JSA all money, profits and anticipated profits lost, wasted or inappropriately diverted in violation of the fiduciary and other duties that he owed as an officer, director, manager and shareholder of the company; (3) appoint and empower a receiver pursuant to Mo. Stat. § 515.240 to administer, oversee and/or assist in the accounting prayed for above, at Jantsch's expense.  Slaggie further requests that the Court award him his costs and expenses in bringing this action, including attorneys' fees, any such other relief as the Court deems just and proper.

Case 4:07-cv-00041-DW   Document 7   Filed 01/29/07   Page 29 of 46

## Count X
## (Prayer for Accounting v. JSES)

Slaggie states the following for Count X of his Counterclaim:

138.    Slaggie incorporates by reference all preceding allegations.

139.    At all times relevant hereto, Slaggie was an owner and holder of shares in JSES.

140.    Slaggie fairly and adequately represents the interests of the shareholders of the corporation.

141.    As an officer, director and shareholder of JSES, Jantsch owed a fiduciary duty and duties of trust and loyalty to both the corporation and its officers, directors and shareholders, requiring him to exercise the utmost good faith in the discharge of his duties.

142.    As an officer, director and shareholder of JSES, Jantsch has misapplied and wasted the assets of JSES, and upon information and belief will continue to waste and misapply the assets of the company, all as is more particularly described above.

143.    Jantsch has further violated the trust and confidence reposed in him and breached the fiduciary and other duties that he owed to JSES and Slaggie by, among other things, diverting corporate assets to his own purposes and deriving personal profits either directly or indirectly from it, all as is more particularly described above.

144.    Jantsch has still further violated the trust and confidence reposed in him and breached the fiduciary and other duties that he owed to JSES and Slaggie by, among other things, intentionally attempting to divert JSES funds from a corporate account to an account owned solely by Jantsch.

145.    Slaggie has requested Jantsch to provide an accurate accounting with respect to his dealings with the corporation's property and business but, despite his requests, Jantsch has refused

30

to provide the same.

146.     Slaggie, despite repeated requests, both before and after his resignation from JSES, has not been allow full access to the company's books and records.

147.     In fact, Jantsch has taken steps to freeze Slaggie out of access to corporate records, despite the fact that he is a 50% shareholder in the corporation.

148.     As such, Slaggie has basis for evaluating the true worth of the company, or what damage Jantsch has caused due to his incompetence and self-dealing.

149.     Any effort to address this behavior through the corporation or its shareholders is and was futile, as Jantsch at all relevant times took steps to freeze Slaggie out of his interest in JSES. Furthermore, during the time of Slaggie's employment with the company, Jantsch concealed many of his actions, and Slaggie is and was unable to ascertain the full extent of the actions taken contrary to the interest of the corporation.  As such, a derivate suit is the only remedy available to Slaggie.

150.     Unless Jantsch and JSES are compelled to provide an accurate accounting with respect to Jantsch's dealings with the property and business of JSES, Slaggie will not have an adequate remedy at law since he will not be able to determine with reasonable certainty the damages to which he and/or JSES are entitled as a result of Jantsch's wrongful conduct, or the true value of his shares in JSES.

WHEREFORE, Slaggie prays that the Court (1) direct Jantsch to provide an accurate account with respect to his dealings with the property and business of JSES, including the disposition of the company's funds and property; (2) compelling Jantsch to account for and repay to JSES all money, profits and anticipated profits lost, wasted or inappropriately diverted in violation of the fiduciary and other duties that he owed as an officer, director, manager and shareholder of the company; (3) appoint and empower a receiver pursuant to Mo. Stat. § 515.240 to administer,

oversee and/or assist in the accounting prayed for above, at Jantsch's expense. Slaggie further requests that the Court award him his costs and expenses in bringing this action, including attorneys' fees, any such other relief as the Court deems just and proper.

**Count XI**
**(Prayer for Judicial Dissolution v. JSA)**

Slaggie states the following for Count XI of his Counterclaim:

151. Slaggie incorporates by reference all preceding allegations.

152. At all times relevant hereto, Slaggie was an owner and holder of shares in JSA.

153. Slaggie fairly and adequately represents the interests of the shareholders of the corporation.

154. As an officer, director and controlling shareholder of JSA, Jantsch owed a fiduciary duty and duties of trust and loyalty to both the corporation and its officers, directors and shareholders, requiring him to exercise the utmost good faith in the discharge of their duties.

155. As an officer, director and controlling shareholder of JSA, has acted, and upon information and belief will continue to act, in a manner that is illegal, oppressive and/or fraudulent, all as is more particularly described above.

156. As an officer, director and controlling shareholder of JSA, Jantsch has also misapplied and wasted the assets of JSA, and upon information and belief will continue to waste and misapply the assets of the company, all as is more particularly described above.

157. Jantsch has further violated the trust and confidence reposed in him and breached the fiduciary and other duties that he owed to JSA and Slaggie by, among other things, diverting corporate assets to his own purposes and deriving personal profits either directly or indirectly from it, all as is more particularly described above.

158. Jantsch has still further violated the trust and confidence reposed in him and

breached the fiduciary and other duties that he owed to JSA and Slaggie by, among other things, intentionally divesting JSA of assets to artificially reduce the value of Slaggie's shares in the company, all as is more particularly described above.

159.     JSA's continued operation as Jantsch Slaggie Architects misrepresents and confuses the public as Slaggie is no longer employed at JSA.

160.     Any effort to address this behavior through the corporation or its shareholders is and was futile, as Jantsch at all relevant times held an outright majority of JSA's stock, and currently constitutes the only member of the board of directors. Furthermore, during the time of Slaggie's employment with the company, Jantsch concealed many of his actions, and Slaggie is and was unable to ascertain the full extent of the actions taken contrary to the interest of the corporation. As such, a derivate suit is the only remedy available to Slaggie.

WHEREFORE, Slaggie prays that the Court judicially dissolve JSA and appoint and empower a receiver to wind up and liquidate the company's business and affairs pursuant to Mo. Stat. §§ 351.494, 498 at Jantsch's expense. Alternatively, Slaggie prays for an order compelling Jantsch as an alternative to judicial dissolution to purchase Slaggie's stock in JSA at a price to be determined by a receiver or some other person specifically appointed to determine the fair market value of the stock. Slaggie further requests that the Court award him his costs and expenses in bringing this action, including attorneys' fees, any such other relief as the Court deems just and proper.

## Count XII
**(Prayer for Judicial Dissolution v. JSES)**

Slaggie states the following for Count XII of his Counterclaim:

161.     Slaggie incorporates by reference all preceding allegations.

162.     At all times relevant hereto, Slaggie was an owner and holder of shares in JSES.

33

163. Slaggie fairly and adequately represents the interests of the shareholders of the corporation.

164. As an officer, director and shareholder of JSES, Jantsch owed a fiduciary duty and duties of trust and loyalty to both the corporation and its officers, directors and shareholders, requiring him to exercise the utmost good faith in the discharge of their duties.

165. As an officer, director and shareholder of JSES, has acted, and upon information and belief will continue to act, in a manner that is illegal, oppressive and/or fraudulent, all as is more particularly described above.

166. As an officer, director and shareholder of JSES, Jantsch has also misapplied and wasted the assets of JSES, and upon information and belief will continue to waste and misapply the assets of the company, all as is more particularly described above.

167. Jantsch has further violated the trust and confidence reposed in him and breached the fiduciary and other duties that he owed to JSES and Slaggie by, among other things, diverting corporate assets to his own purposes and deriving personal profits either directly or indirectly from it, all as is more particularly described above.

168. Jantsch has still further violated the trust and confidence reposed in him and breached the fiduciary and other duties that he owed to JSES and Slaggie by, among other things, intentionally divesting JSES of assets to artificially reduce the value of Slaggie's shares in the company, all as is more particularly described above.

169. Jantsch has still further violated the trust and confidence reposed in him and breached the fiduciary and other duties that he owed to JSES and Slaggie by, among other things, intentionally attempting to divert JSES funds from a corporate account to an account owned solely by Jantsch.

34

170.    Any effort to address this behavior through the corporation or its shareholders is and was futile, as Jantsch at all relevant times took steps to freeze Slaggie out of his interest in JSES. Furthermore, during the time of Slaggie's employment with the company, Jantsch concealed many of his actions, and Slaggie is and was unable to ascertain the full extent of the actions taken contrary to the interest of the corporation. As such, a derivate suit is the only remedy available to Slaggie.

WHEREFORE, Slaggie prays that the Court judicially dissolve JSES and appoint and empower a receiver to wind up and liquidate the company's business and affairs pursuant to Mo. Stat. §§ 351.494, 498 at Jantsch's expense. Alternatively, Slaggie prays for an order compelling Jantsch as an alternative to judicial dissolution to purchase Slaggie's stock in JSES at a price to be determined by a receiver or some other person specifically appointed to determine the fair market value of the stock. Slaggie further requests that the Court award him his costs and expenses in bringing this action, including attorneys' fees, any such other relief as the Court deems just and proper.

### Count XIII
### (Violation of RSMo. 351.215 v. Jantsch, JSA, and JSES)

Slaggie states the following for Count XIII of his Counterclaim.

171.    Slaggie incorporates by reference all preceding allegations.

172.    Pursuant to Mo. Stat. § 351.215, JSA and JSES were required to keep correct and complete books and records of account and provide access to the books of JSA and JSES to their shareholders for examination.

173.    In accordance with his statutory and common law rights of inspection, Slaggie, as a shareholder of JSA, made demands on JSA on November 11, 22, and 29, 2005, and January 19 and 20, 2006 for the examination of JSA's complete books and records of account.

174.    In accordance with his statutory and common law rights of inspection, Slaggie, as

a shareholder of JSES, made demand on JSES on November 22, 2005 for the examination of JSES complete books and records of account.

175.    JSA and JSES by and through their officer and director Jantsch have refused and/or failed to provide correct and complete books of account.

176.    Pursuant to Mo. Stat. § 351.215, each such failure shall result in payment by the officer having charge of such books in the amount of $250.00.

WHEREFORE, Slaggie prays as follows:

(a)    For an order in mandamus directing JSA and Jantsch to provide immediate and complete access of JSA and JSES' books and records of account to Slaggie.

(b)    That the Court fine Jantsch in the amount of $1,500.00 for refusing or neglecting to make the books and records of JSA and JSES available to Slaggie as requested; and

(c)    Such other relief as this Court deems just and equitable.

### Count XIV
**(Declaratory Relief as to Valuation of Shares and Determination of Rights and Obligations under JSA Shareholder Agreement v. JSA and Jantsch)**

Slaggie states the following for Count XIV of his Counterclaim:

177.    Slaggie incorporates by reference all preceding allegations.

178.    As described more fully above, Jantsch's negligence and self-dealing have harmed JSA.  However, due to Jantsch's concealment and his refusal to provide Slaggie access to JSA's corporate books and records, the scope and extent of the injury to JSA and Slaggie's interest therein, is unknown.

179.    On January 15, 2006, JSA, through Jantsch as President, served Slaggie with notice that it was electing to purchase his 4,725 shares pursuant to JSA's shareholders agreement.  Slaggie was informed that "the aggregate value of your shares has been calculated to

be $33,859.13." Slaggie had reason to suspect that this valuation was artificially low, in that it did not take into account the diminution in value of JSA due to Jantsch's negligence and self dealing and misapplied the appropriate triggering date for such calculations. However, since Slaggie had, and has to date, been deprived of full access to the company's books and records, he had no ability to make an independent evaluation of the purchase offer.

180.    JSA's effort to exercise any option to purchase Slaggie's shares was ineffective under the terms of the Shareholder's Agreement.

181.    Upon information and belief, Jantsch has intentionally divested JSA of assets to artificially reduce the value of Slaggie's shares in the company, all as is more particularly described above.

182.    This Court has the authority pursuant to 28 U.S.C. §§ 2201-2202 to declare the true value of Slaggie's shares in JSA, determine the parties rights and obligations under the JSA Shareholders Agreement, and to order any such further relief as necessary.

WHEREFORE, Slaggie respectfully requests that the Court enter a declaratory judgment setting forth the true value of Slaggie's shares in JSA, determining the rights and obligations of the parties to the JSA Shareholders Agreement, and granting Slaggie what further relief may be fair and equitable.

Slaggie further requests that the Court award him his costs and expenses in bringing this action, including attorneys' fees, any such other relief as the Court deems just and proper.

**Count XV**
**(Conversion by Slaggie v. Jantsch)**

Slaggie states the following for Count XV of his Counterclaim:

183.    Slaggie incorporates by reference all preceding allegations.

184.    Slaggie, as an officer, director, and shareholder of JSA and JSES had the right to

access to corporate accounts, and the right to possession of his share of the funds in those accounts.

185.     At various times and in various manners as more fully described above, Jantsch wrongfully converted corporate assets, including corporate accounts, to his own use, and deprived Slaggie from his rightful access to the same.

186.     This conversion was without authorization.

187.     Jantsch has refused, despite demand, to return said converted assets.

188.     Such conduct was undertaken maliciously and in bad faith for Jantsch's own personal gain and benefit at the expense of JSA, JSES and Slaggie.

WHEREFORE, Slaggie prays that the Court enter judgment in favor of Slaggie and to award relief in favor of Slaggie including, but not limited to, the following:

(1)     The return of all assets wrongfully converted by Jantsch.

(2)     Punitive damages.

(3)     Slaggie's costs, expenses and attorneys' fees incurred in defending and prosecuting this action as provided for by the JSA Bylaws.

(4)     Such other and further relief as this Court deems just and equitable.

### Count XVI
### (Tortious Interference With Contract By Slaggie and SAI v. JSA)

Slaggie states the following for Count XVI of his Counterclaim:

189.     Slaggie incorporates by reference all preceding allegations.

190.     After Slaggie was forced to terminate his director and employment relations with JSA, he formed SAI.

191.     SAI entered into contracts with various clients for the performance of architectural services.

192. Jantsch and JSA had knowledge of the contracts between SAI and its clients.

193. Jantsch and JSA caused and induced clients of SAI to breach or terminate their contracts with SAI without specification.

194. In intentionally interfering with such contractual relations, JSA and Jantsch asserted unsupported copyright claims, and threatened to sell the clients' plans to other developers.

195. In intentionally interfering with such contractual relations, JSA and Jantsch purposefully did not respond to phone calls, letters and other means of communication made by clients of JSA to reach an understanding of mutual obligations, continuation of ongoing services and invoices due.

196. In intentionally interfering with such contractual relations, JSA and Jantsch, despite demands to the contrary, represented to clients, consultants, vendors, and the general public that Slaggie, Highbarger, and other employees of SAI were employees of JSA through JSA's phone answering system, website, email system and other marketing material, thereby intentionally confusing current and potential clients of SAI.

197. Such conduct was undertaken in bad faith with the intent and purpose of harming both SAI and its clients by unnecessarily causing a delay in such projects.

WHEREFORE, SAI prays that the Court enter judgment in favor of Slaggie and SAI and to award relief in favor of SAI including, but not limited to, the following:

(1) All compensatory damages sustained by SAI as a result of the conduct of Defendants JSA and Jantsch.

(2) Injunctive relief ordering Jantsch and JSA to seize and desist asserting copyright claims which have no basis in fact or law.

(3)     Punitive damages.

(4)     SAI's costs, expenses and attorneys' fees incurred in defending and prosecuting this action as provided for by the JSA Bylaws.

(5)     Such other and further relief as this Court deems just and equitable.

## COUNT XVII
**(Breach of Implied Covenant Of Good Faith And Fair Dealing v. Jantsch and JSA)**

Slaggie states the following for Count XVII of his Counterclaim:

198.    Slaggie incorporates by reference the preceding allegations of this Counterclaim as though fully set forth herein.

199.    In entering into compensation and shareholder agreements with Plaintiff, and based upon the relationship of the parties, including their corporate positions and ownership as well as their course of dealing, among other things, required that:

(b)     Jantsch and JSA would act with good faith and fairness toward Slaggie on all matters concerning corporate affairs, compensation and stock value.

(c)     Neither Jantsch nor JSA would take any action to unfairly prevent Slaggie from obtaining the benefits of his corporate position, his compensation, or his rights under the Shareholder's Agreement.

(d)     Jantsch and JSA would comply with its own rules, policies and procedures with respect to providing and making financial information available to Slaggie, consulting with him on corporate matters and in paying compensation to shareholders.

200.    Jantsch and JSA's conduct forced Slaggie to resign from his position at JSA and resulted in a substantial devaluation of his stock.   Further, the bad faith exercised by Jantsch and JSA was done with the purpose and intent of avoiding or diminishing payments owed to Slaggie for compensation and the value of his shares.

201.    Jantsch and JSA breached their covenant of good faith and fair dealing in one or more of the respects set forth herein:

(a)    Jantsch and JSA wrongfully and without any basis in fact or law denied Slaggie access to the corporate financial records of JSA both before and after the termination of his employment with JSA.

(b)    Jantsch and JSA purposefully and wrongfully failed and refused to pay Slaggie for the sums due him under the terms of the compensation agreement.

(c)    Jantsch and JSA unilaterally and in direct violation of it's own agreement and practice with Slaggie permitted Jantsch to unilaterally compensate himself and make corporate decisions to the detriment of Slaggie, and JSA without authorization to do so.

(d)    Jantsch and JSA intentionally failed to collect accounts receivable and took other similar action with the purpose of negatively impacting the value of Slaggie's stock and depriving Slaggie of the full amount of compensation owed him under JSA compensation agreement.

(e)    Jantsch and JSA otherwise unfairly prevented Slaggie from obtaining the benefits of his relationship with JSA.

(f)    Jantsch and JSA wrongfully and constructively caused Slaggie to terminate his relationship with JSA.

(g)    Jantsch and JSA did the other wrongful acts described herein.

202.    Such breach was done by Jantsch to exploit economic conditions to his own benefit, to obtain compensation in excess of that provided for by the employment agreement, and to intentionally undermine the fulfillment of JSA's contractual obligations to Slaggie.

203.    Jantsch and JSA's breach of the covenant of good faith and fair dealing was a

substantial factor in causing damage and injury to Slaggie.

204.    As a direction and proximate result of Jantsch and JSA's unlawful conduct alleged in this Petition, Slaggie has lost substantial compensation and other benefits in an amount in excess of $25,000. Slaggie has further suffered extreme anguish, humiliation and emotional distress due to such conduct in an amount to be determined at trial.

WHEREFORE, Plaintiff Slaggie prays for judgment in an amount in excess of $25,000.00; for its costs incurred herein; for prejudgment and postjudgment interest; for punitive damages and for such other and further legal and equitable relief as the Court deems just and proper.

## COUNT XVIII
### (Replevin v. Jantsch and JSA)

Slaggie states the following for Count XVIII of his Counterclaim:

205.    Slaggie incorporates by reference the preceding allegations of this Counterclaim as though fully set forth herein.

206.    Prior to his employment with JSA, Slaggie previously worked at the firm Slaggie Greer Architects, Inc ("Slaggie Greer").

207.    When Slaggie joined JSA, he brought with him corporate records, employee files, invoices, CDs, backup tapes and floppy disks of record sets and as-built documents, and hard copies of record sets/ stamped documents/ as-builts of documents for a variety of projects at Slaggie Greer (hereinafter "the Slaggie Greer files").

208.    At all relevant times, Slaggie was and is the owner of the Slaggie Greer files and is entitled to immediate possession of the same.

209.    After Slaggie's resignation, JSA and Jantsch retained custody and control of the Slaggie Greer files.

210. Despite repeated requests for the files to be produced for Slaggie to pick up, JSA and Jantsch have refused to provide the Slaggie Greer files.

211. Jantsch's refusal to produced Slaggie's personal files has been malicious and in bad faith for Jantsch's own personal gain and benefit at the expense of Slaggie.

WHEREFORE, Slaggie prays that the Court enter judgment in favor of Slaggie and to award relief in favor of Slaggie including, but not limited to, the following:

(1) The return of the Slaggie Greer files, which have been wrongfully retained by JSA and Jantsch.

(2) Punitive damages against Jantsch.

(3) Slaggie's costs, expenses and attorneys' fees incurred in defending and prosecuting this action as provided for by the JSA Bylaws.

(4) Such other and further relief as this Court deems just and equitable.

## Count XIX
### (Declaratory Relief as to Purported Copyright Claims v. JSA and Jantsch)

Slaggie states the following for Count XIX of his Counterclaim:

212. Slaggie incorporates by reference all preceding allegations.

213. This Court has original and exclusive subject matter jurisdiction over this count pursuant to 28 U.S.C. §§ 1331 and 1338(a) in that it implicates the Copyright Act.

214. As noted above, after Slaggie was forced to terminate his director and employment relations with JSA, he formed SAI.

215. SAI entered into contracts with various clients for the performance of architectural services.

216. Jantsch and JSA caused and induced clients of SAI to breach or terminate their contracts with SAI without specification.

217. Without the right or legal authority to do so, JSA and Jantsch have asserted unsupported copyright claims against various SAI clients, and have threatened to sell the clients' plans to other developers.

218. JSA and Jantsch have sent letters to various SAI clients alleging violations of purported (but always unspecified) JSA copyrights.

219. Neither JSA nor Jantsch has complied with the requirements of 17 U.S.C. § 411 with respect to any alleged copyrights.

220. As JSA and Jantsch have asserted the existence of alleged copyright violations as a part of their efforts to interfere with Slaggie's current client relationships, Slaggie will continue to suffer harm until the existence or non-existence of such copyright violations is determined.

WHEREFORE, Slaggie respectfully requests that the Court enter a declaratory judgment stating (1) that Jantsch and JSA do not have any protectable copyright interest and/or claim as to the drawings, plans, or other architectural documents for which Jantsch and JSA claim copyright infringement; (2) that former clients of JSA that were or are clients of SAI, as well as Slaggie and SAI, may continue to use said documents in the manner in which they are currently being used, if any; (3) that former clients of JSA that were or are clients of SAI have not infringed any copyrights held by Jantsch or JSA; and (4) that Slaggie, in the course of performing architectural services for former clients of JSA that were or are clients of SAI, has not infringed any copyrights held by Jantsch or JSA.

Slaggie further requests that the Court award him his costs and expenses in bringing this action, including attorneys' fees, any such other relief as the Court deems just and proper.

Respectfully Submitted,

WALTERS BENDER STROHBEHN
& VAUGHAN, P.C.


By     s/ Matthew R. Crimmins
   Karen Wedel Renwick, Mo. Bar  #41271
   Matthew R. Crimmins, Mo. Bar #53138
   2500 City Center Square
   1100 Main Street
   P.O. Box 26188
   Kansas City, MO 64196
   (816) 421-6620
   (816) 421-4747 (Facsimile)
ATTORNEYS FOR DEFENDANTS
SCOTT SLAGGIE AND
SLAGGIE ARCHITECTS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2007 I electronically filed the above and foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to the following:

Stephen R. Miller
Miller Law Firm, P.C.
4310 Madison Avenue
Kansas City, MO 64111
Attorneys for Plaintiff

_____s/ Matthew R. Crimmins_____
Attorney for Defendants Scott Slaggie and Slaggie
Architects, Inc.